IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **ANDRE JENNINGS**<br><br>Plaintiff,<br><br>vs.<br><br>**ED NAPLETON ELMHURST IMPORTS INC.**,<br><br>Defendant. | CASE NO.<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff, Andre Jennings, upon personal knowledge as to himself and upon information and belief as to other matters, hereby complains as follows:

## NATURE OF THE CLAIMS

1. Plaintiff brings claims for hostile work environment based on race, disparate treatment based on race, and retaliation pursuant to 42 U.S.C. §1981 ("Sec. 1981"); Title VII of the Civil Rights act of 1964, 42 U.S.C. 2000e, et seq. ("Title VII"); and the Illinois Human Rights Act 775 ILCS 5/1 et seq., (the "IHRA").

## VENUE AND JURISDICTION

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(4).

3. This Court has supplemental jurisdiction over the IHRA claims pursuant to 28 U.S.C. §1367.

4. Pursuant to 28 U.S.C. §1391(b), venue is proper in the Northern District of Illinois because the conduct complained of herein took place within this judicial district.

## ADMINISTRATIVE EXHAUSTION

5. Plaintiff filed a timely Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on February 5, 2023, alleging discrimination on the basis of his race and color.

6. Plaintiff's Charge of Discrimination was dual filed with the Illinois Department of Human Rights. (Ex. 1).

7. The EEOC issued Plaintiff a Notice of Right to Sue letter on June 27, 2023. (Ex. 2).

8. Plaintiff exhausted his administrative remedies pursuant to Title VII.

9. Plaintiff is in the process of obtaining a right to sue notice from the Illinois Department of Human Rights.

## PARTIES

**Plaintiff**

10. Plaintiff is African American.

11. At all relevant times, from April 23, 2019 through November 14, 2022, Plaintiff was a Salesperson at Defendant's dealership, Napleton's Kia of Elmhurst.

12. At all relevant times, Plaintiff was an employee of Defendant within the meaning of Title VII.

13. As an employee of Defendant, Plaintiff had a contractual relationship with Defendant within the meaning of §1981.

**Defendant**

14. Defendant is an automotive dealership, selling new Kias and used cars.

15. Defendant does business as Napleton's Kia of Elmhurst, located at 727 W. Grand Avenue, Elmhurst, IL 60126.

16. At all relevant times, Defendant was Plaintiff's employer within the meaning of Title VII.

17. As Plaintiff's employer, Defendant had a contractual relationship with Plaintiff within the meaning of §1981.

18. During Plaintiff's employment, Defendant's Platform Manager was Hitko Kadric ("Hitko").

19. Hitko was the highest-ranking employee at Defendant.

20. During Plaintiff's employment, Defendant's General Manager was Miki Kadric ("Miki").

21. Miki was the second highest ranking employee at Defendant.

22. Miki and Hitko are brothers.

23. Plaintiff reported directly to both Hitko and Miki.

24. Defendant gave both Hitko and Miki authority to make official employment decisions to significantly alter Plaintiff's employment status, including, *inter alia,* authority to make hiring, compensation, disciplinary, and termination decisions.

25. Hitko and Miki regularly conferred about employment decisions that significantly altered Plaintiff's employment status.

26. At times, Hitko would adopt or enforce Miki's recommendations concerning employment decisions that significantly affected Plaintiff's employment status.

**FACTUAL ALLEGATIONS**

27. Throughout Plaintiff's employment, a clear racial divide between African American and white employees existed at Defendant.

28. Of the sixty to seventy-five employees who worked at Defendant, only a small percentage were African American.

29. During the relevant time period only approximately two or three African Americans worked at Defendant at any given time.

30. Defendant's workforce was overwhelmingly white.

31. When Defendant did hire African Americans, they often resigned shortly after being hired.

32. Those who stayed were subjected to an ongoing, racially hostile culture where frequent racial slurs, comments, stereotypes, and jokes saturated the workplace.

33. By way of example and not limitation, almost immediately after Plaintiff started working at Defendant, and continuing through to his termination, Miki and other white employees used racial slurs to refer directly to Plaintiff or in his or other African American employees' presence.

34. Miki casually and openly used the N word towards Plaintiff on numerous occasions.

35. For instance, if Plaintiff made a sale, Miki would often say: "take this deal back to finance, my nigg*r."

36. Miki regular referred to Plaintiff and other African American's as "my nigg*r."

37. Plaintiff heard Miki or other white employees use the N word at least two or three times per week throughout his employment at Defendant.

38. One of Plaintiff's African American coworkers ("Coworker 1"), who worked at Defendant during the relevant time period, also heard Miki and other white salespeople and managers use the N word on a near-daily basis.

39. On one occasion, shortly after Plaintiff filed his EEOC Charge, Miki called Coworker 1 to his office and said something to effect of: "Did I ever call [Plaintiff] a nigg*r?"

40. Coworker 1 also heard Hitko use the N word.

41. Another African American former employee of Defendant ("Coworker 2"), who worked at Defendant during the relevant time period, heard Miki use the N word regularly, casually, and openly.

42. Coworker 2 heard Miki use the N word towards Plaintiff.

43. Plaintiff was personally aware that other African American employees were subjected to the same racial slurs to which he was subjected because he either overheard the slurs or they told Plaintiff about their experiences with racial harassment.

44. In addition to the N word, Miki often used other highly offensive racial slurs and stereotypes to refer to African Americans.

45. For example, Miki referred to African Americans as "shines" on numerous occasions when speaking with Plaintiff.

46. Miki and other white employees would make frequent "jokes" drawing on offensive stereotypes, such as saying that African Americans loved to eat fried chicken, along with similar offensive racist tropes.

47. Miki and other white employees openly used racial slurs, including the N word in the sales tower and in the smoking area, among other common areas at Defendant.

5

48. The sales tower is where all sales are finalized and sales managers, finance managers, and other supervisors were regularly present and would have heard the racial slurs.

49. Several supervisors also frequented the smoke area where Miki and others openly used the N word and other offensive racial language and would have heard the racial slurs.

50. Coworker 1 heard Miki use the N word in the presence of supervisors and managers on numerous occasions.

51. Despite that supervisors and managers heard Miki use the N word and other racial slurs, Defendant took no remedial action.

52. In addition to, and often in conjunction with the use of the racial slurs, Miki would frequently belittle Plaintiff and other African Americans by yelling at them or calling them names, such as "stupid."

53. Plaintiff and other African American employees heard Miki regularly refer derogatorily to African American customers as "the blacks" and claimed they were not "as educated as white people."

54. Whenever an African American customer was dissatisfied with a deal or if Miki made a customer upset about something, he would come get Plaintiff and say: "go calm your brother down," "go calm your people down," or "you know how to handle your own kind," among other similar statements.

55. In addition to the frequent racial slurs, Plaintiff and other African American employees were subjected to excessive scrutiny, monitoring, and discriminatory treatment concerning the terms and conditions of their employment.

56. By way of example and not limitation, Miki constantly badgered Plaintiff about his whereabouts, where he parked, and what time he arrived or left for work.

6

57. Miki often threatened Plaintiff with suspension or termination over the alleged "infractions."

58. At times, Miki would threaten Plaintiff by saying: "I will have Hitko fire you."

59. White employees' whereabouts or attendance were not similarly scrutinized.

60. Plaintiff was routinely disciplined for "attendance" issues while white employees were not similarly disciplined if they were late or left early.

61. By way of further example and not limitation, in or around November 2021, Plaintiff was suspended from work for parking in the wrong parking space.

62. White employees were not disciplined when they parked where Plaintiff did.

63. About two weeks after Plaintiff's suspension, news broke that Defendant had agreed to pay nearly $10 million to settle a case brought by the Federal Trade Commission and the State of Illinois, which alleged, in part, that Defendant discriminated against Black customers.

64. Almost immediately after the news of the settlement, Defendant called Plaintiff back to work.

65. Plaintiff felt as if he was only called back to work as a charade for Defendant to show the public it had African American employees.

66. In contrast to Defendant's treatment of Plaintiff, white workers would go unpunished for committing far worse infractions than parking in the wrong space.

67. By way of example and not limitation, around the time that Plaintiff was suspended for parking in the wrong space, a white employee was caught smoking marijuana in a vehicle Defendant was selling.

7

68. Upon information and belief, Defendant did not discipline the employee.

69. Plaintiff and other African American employees were also paid less than similarly situated white employees.

70. Plaintiff and other African American employees received less commissions than white employees.

71. Defendant would wrongfully withhold commission percentages owed to Plaintiff and other African American salespeople under their payment plan.

72. Defendant did not similarly withhold commissions from white salespeople.

73. Plaintiff asked several white salespeople whether they were receiving the commissions they were owed under the payment plant.

74. Not one white employee with whom Plaintiff spoke reported their commissions did not add up or that they otherwise believed they were being underpaid.

75. Miki's racial harassment of Plaintiff, including his frequent use of the N word, "shine," racial stereotypes, and offensive racial comments, as well as his racially motivated scrutiny and monitoring culminated in tangible employment actions, which Miki either made himself or which other Defendant decision makers enforced on Miki's behalf, including but not limited to: discipline for unwarranted attendance "infractions," a two-week unpaid suspension that Plaintiff received for parking in the wrong space, denying Plaintiff commissions that he earned in accordance with the payment plan, and ultimately, termination of Plaintiff's employment.

76. On November 14, 2022, Plaintiff questioned why an employee was sitting within earshot of his customer who was providing sensitive information to Plaintiff related to the customer's purchase of a vehicle.

77. It is against company policy for employees who are not involved in a sale to eavesdrop on or otherwise be present while a salesperson works with a customer. This policy is designed to protect customers who are sharing sensitive information during the course of a sale.

78. Plaintiff noticed that the policy was not being enforced while he was working with customers.

79. When Plaintiff questioned why the employee was present, Miki jumped up, slammed his desk, and yelled: "Why the hell do you care if someone is sitting next to you!?"

80. Plaintiff was humiliated by Miki's demeaning and aggressive response to a reasonable question concerning company policy.

81. Miki never openly berated white employees like he did to Plaintiff.

82. Plaintiff was exhausted from years of Miki's harassment and reached his wits end when Miki publicly humiliated him by yelling at him in front of everyone, including Plaintiff's customer.

83. In frustration, Plaintiff responded in kind.

84. Miki and Hitko then conferred.

85. Hitko then communicated to Plaintiff that Defendant was firing him.

86. Plaintiff said, "okay," and walked out.

87. Upon information and belief, Miki was not disciplined for publicly yelling at and using profanity towards Plaintiff.

88. Plaintiff complained on numerous occasions that Defendant was withholding his commissions, including reporting the issue to Miki, Hitko, and Defendant's human resources department.

89. In or around August 2022, Plaintiff told Amanda "Last Name Unknown" in human resources that he believed Defendant was wrongfully withholding his commissions.

90. Plaintiff specifically told her that the other salespeople were not having issues with commissions like he was.

91. He went through his sales, one-by-one, with Amanda.

92. About halfway through the list, Amanda stopped Plaintiff and said: "You know they can pay you whatever they want" and that Plaintiff was not owed commissions.

93. Amanda's response was false.

94. Plaintiff's compensation was made up almost entirely of commissions.

95. When Plaintiff complained to Defendant, including to Miki, Hitko, and Amanda, about his concerns of unfair compensation practices, he provided enough information that any reasonable employer intent on complying with antidiscrimination laws would have understood he was making a complaint of discrimination.

96. Defendant never investigated Plaintiff's complaint.

97. A reasonable investigation into Plaintiff's complaint would have revealed that Defendant was discriminating against its African American salespeople.

98. As a consequence of Plaintiff's protected activity, Defendant subjected him to materially adverse actions designed to punish him for reporting discrimination and to chill further opposition.

99. By way of example and not limitation, shortly after Plaintiff's complaints of discrimination, Defendant subjected him to discipline for alleged attendance infractions.

100. Defendant also suspended Plaintiff for two weeks for alleged parking violations, which prior to Plaintiff complaining of discriminatory commissions, he had never previously been disciplined despite that he parked in the same spot.

101. White employees who did not report discrimination and who engaged in similar or more severe violations were not subjected to discipline or suspensions.

102. Defendant's ultimate termination of Plaintiff's employment was in retaliation for his reports of discriminatory pay practices.

103. Plaintiff suffered from emotional distress and lost wages, which were proximately caused by Defendants' illegal harassment and retaliation.

## CAUSE OF ACTION

### COUNT 1

**Hostile Work Environment  
in violation of 42 U.S.C. §1981**

104. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

105. The foregoing conduct violates 42 U.S.C. §1981.

106. Defendant engaged in illegal, intentional discrimination by subjecting Plaintiff to a hostile work environment based on his race, African American.

107. Defendant subjected Plaintiff to severe or pervasive racial harassment.

108. Defendant was aware of the harassment that Plaintiff experienced.

109. Despite Defendant's knowledge of the harassment perpetrated against Plaintiff, it failed to take adequate remedial measures.

110. As a consequence of Defendant's failure to take adequate remedial measures, the harassment against Plaintiff and other African American employees continued and intensified.

111. Plaintiff's supervisors—to whom Defendant gave authority to make official employment decisions to significantly alter Plaintiff's employment status—participated in and condoned the racial harassment against Plaintiff.

112. Plaintiff's supervisors' harassment culminated in tangible employment actions, including without limitation, discipline, denied commissions, suspension, and termination.

113. As a consequence of Defendant's unlawful conduct, Plaintiff suffered severe emotional distress and lost wages.

114. Defendant's actions proximately caused Plaintiff's injuries.

115. Plaintiff requests relief as provided in the Prayer for Relief below.

## COUNT 2

### Disparate Treatment
### in violation of 42 U.S.C. §1981

116. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

117. The foregoing conduct violates 42 U.S.C. §1981.

118. Defendant engaged in intentional discrimination by, *inter alia,* treating Plaintiff differently and worse than similarly situated white employees with respect to compensation, discipline, and termination decisions.

119. As a consequence of Defendant's actions, Plaintiff suffered emotional distress and economic injury.

120. Defendant's actions proximately caused Plaintiffs' injuries.

## COUNT 3

### Retaliation
### In violation of 42 U.S.C. §1981

121. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

122. The foregoing conduct violates 42 U.S.C. §1981.

123. Defendants engaged in illegal, intentional discrimination by retaliating against Plaintiff after he engaged in protected activity.

124. Plaintiff had a reasonable, good faith belief that Defendant engaged in unlawful discrimination against him.

125. Because of Plaintiff's reasonable, good faith belief that Defendant subjected him to unlawful discrimination, Plaintiff reported the conduct to members of Defendant's management team and human resources.

126. Following Plaintiff's complaints, Defendant subjected Plaintiff to materially adverse employment actions designed to punish him for his complaints and dissuade Plaintiff and other employees from reporting discrimination in the future.

127. But for Plaintiff's complaints, Defendant would not have subjected Plaintiff to the following materially adverse employment actions, including without limitation:

    a. Attendance discipline;

    b. Denying Plaintiff Commissions;

    c. Suspension;

    d. Termination.

128. As a consequence of Defendant's unlawful conduct, Plaintiff suffered severe emotional distress and lost wages.

129. Defendant's actions proximately caused Plaintiff's injuries.

130. Plaintiff requests relief as provided in the Prayer for Relief below.

## COUNT 4

### Hostile Work Environment
### in violation of Title VII

131. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

132. The foregoing conduct violates Title VII

133. Defendant engaged in illegal, intentional discrimination by subjecting Plaintiff to a hostile work environment based on his race, African American.

134. Defendant subjected Plaintiff to severe or pervasive racial harassment.

135. Defendant was aware of the harassment that Plaintiff experienced.

136. Despite Defendant's knowledge of the harassment perpetrated against Plaintiff, it failed to take adequate remedial measures.

137. As a consequence of Defendant's failure to take adequate remedial measures, the harassment against Plaintiff and other African American employees continued and intensified.

138. Plaintiff's supervisors—to whom Defendant gave authority to make official employment decisions to significantly alter Plaintiff's employment status—participated in and condoned the racial harassment against Plaintiff.

139. Plaintiff's supervisors' harassment culminated in tangible employment actions, including without limitation, discipline, denied commissions, suspension, and termination.

140. As a consequence of Defendant's unlawful conduct, Plaintiff suffered severe emotional distress and lost wages.

141. Defendant's actions proximately caused Plaintiff's injuries.

142. Plaintiff requests relief as provided in the Prayer for Relief below.

## COUNT 5

### Disparate Treatment
### in violation of Title VII

143. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

144. The foregoing conduct violates Title VII.

145. Defendant engaged in intentional discrimination by, *inter alia*, treating Plaintiff differently and worse than similarly situated white employees with respect to compensation, discipline, and termination decisions.

146. As a consequence of Defendant's actions, Plaintiff suffered emotional distress and economic injury.

147. Defendant's actions proximately caused Plaintiffs' injuries.

## COUNT 6

### Retaliation
### in violation of Title VII

148. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

149. The foregoing conduct violates Title VII.

150. Defendants engaged in illegal, intentional discrimination by retaliating against Plaintiff after he engaged in protected activity.

151. Plaintiff had a reasonable, good faith belief that Defendant engaged in unlawful discrimination against him.

152. Because of Plaintiff's reasonable, good faith belief that Defendant subjected him to unlawful discrimination, Plaintiff reported the conduct to members of Defendant's management team and human resources.

153. Following Plaintiff's complaints, Defendant subjected Plaintiff to materially adverse employment actions designed to punish him for his complaints and dissuade Plaintiff and other employees from reporting discrimination in the future.

154. But for Plaintiff's complaints, Defendant would not have subjected Plaintiff to the following materially adverse employment actions, including without limitation:

    a. Attendance discipline;

    b. Denying Plaintiff Commissions;

    c. Suspension;

    d. Termination.

155. As a consequence of Defendant's unlawful conduct, Plaintiff suffered severe emotional distress and lost wages.

156. Defendant's actions proximately caused Plaintiff's injuries.

157. Plaintiff requests relief as provided in the Prayer for Relief below.

## COUNT 7

### Hostile Work Environment
### in violation of the Illinois Human Rights Act

158. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

159. The foregoing conduct violates the IHRA.

160. Defendant engaged in illegal, intentional discrimination by subjecting Plaintiff to a hostile work environment based on his race, African American.

161. Defendant subjected Plaintiff to severe or pervasive racial harassment.

162. Defendant was aware of the harassment that Plaintiff experienced.

163. Despite Defendant's knowledge of the harassment perpetrated against Plaintiff, it failed to take adequate remedial measures.

164. As a consequence of Defendant's failure to take adequate remedial measures, the harassment against Plaintiff and other African American employees continued and intensified.

165. Plaintiff's supervisors—to whom Defendant gave authority to make official employment decisions to significantly alter Plaintiff's employment status—participated in and condoned the racial harassment against Plaintiff.

166. Plaintiff's supervisors' harassment culminated in tangible employment actions, including without limitation, discipline, denied commissions, suspension, and termination.

167. As a consequence of Defendant's unlawful conduct, Plaintiff suffered severe emotional distress and lost wages.

168. Defendant's actions proximately caused Plaintiff's injuries.

169. Plaintiff requests relief as provided in the Prayer for Relief below.

## COUNT 8

### Disparate Treatment
### in violation of the Illinois Human Rights Act

170. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

171. The foregoing conduct violates the IHRA.

172. Defendant engaged in intentional discrimination by, *inter alia*, treating Plaintiff differently and worse than similarly situated white employees with respect to compensation, discipline, and termination decisions.

173. As a consequence of Defendant's actions, Plaintiff suffered emotional distress and economic injury.

## COUNT 9

**Retaliation
in violation of the Illinois Human Rights Act**

174. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

175. The foregoing conduct violates the IHRA.

176. Defendants engaged in illegal, intentional discrimination by retaliating against Plaintiff after he engaged in protected activity.

177. Plaintiff had a reasonable, good faith belief that Defendant engaged in unlawful discrimination against him.

178. Because of Plaintiff's reasonable, good faith belief that Defendant subjected him to unlawful discrimination, Plaintiff reported the conduct to members of Defendant's management team and human resources.

179. Following Plaintiff's complaints, Defendant subjected Plaintiff to materially adverse employment actions designed to punish him for his complaints and dissuade Plaintiff and other employees from reporting discrimination in the future.

180. But for Plaintiff's complaints, Defendant would not have subjected Plaintiff to the following materially adverse employment actions, including without limitation:

    a. Attendance discipline;

    b. Denying Plaintiff Commissions;

    c. Suspension;

      d.      Termination.

181. As a consequence of Defendant's unlawful conduct, Plaintiff suffered severe emotional distress and lost wages.

182. Defendant's actions proximately caused Plaintiff's injuries.

183. Plaintiff requests relief as provided in the Prayer for Relief below.

## JURY DEMAND

184. Plaintiff demands trial of his claims by jury to the extent authorized by law.

## PRAYER FOR RELIEF

185. **WHEREFORE**, Plaintiff respectfully requests that judgment be entered against Defendant in his favor and prays for relief as follows:

    a.    An order granting Plaintiff nominal and compensatory damages in an amount to be determined at trial;

    b.    An order granting Plaintiff backpay and front pay in an amount to be determined at trial;

    c.    An order granting Plaintiff punitive damages;

    d.    An order awarding Plaintiff pre-judgment and post-judgment interest;

    e.    An order awarding Plaintiff costs and expenses, including reasonable attorneys' fees;

    f.    An order declaring that Defendant violated 42 U.S.C. § 1981, Title VII, and the IHRA;

    g.    Issue an injunction compelling Defendant to cease and desist racially harassing employees and retaliating against employees who report discrimination;

      h.      Award any other and further relief as this Court deems just and equitable.

Dated: September 25, 2023

                                        Respectfully Submitted,

                                   By: s/Chiquita Hall-Jackson
                                   Chiquita Hall-Jackson
                                   Hall-Jackson & Associates
                                   180 W. Washington Street STE 820
                                   Chicago, Illinois 60602
                                   (312) 255-7105 (telephone)
                                   (312) 690-4763 (facsimile)
                                   chj@hall-jacksonandassociates.com
                                   Attorney for Plaintiff