**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANDRE JENNINGS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:23-cv-14099 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| ED NAPLETON ELMHURST | ) | |
| IMPORTS INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Andre Jennings argues that this Court should determine whether his former employer, Ed

Napleton Elmhurst Imports Inc. ("Napleton"), engaged in unlawful discrimination and/or

retaliation. But Jennings signed a valid and binding arbitration agreement covering his claims, so

those questions are for an arbitrator, not the Court, to decide. For the reasons that follow, the Court

(1) grants Napleton's motion to compel, and (2) stays these proceedings pending arbitration.

**I.      BACKGROUND**

In April 2019, Jennings began working as a car salesman at Napleton's Kia dealership in

Elmhurst, Illinois. The job involved three main responsibilities. First, and perhaps unsurprisingly,

Jennings was responsible for selling cars. Jennings would greet customers and show them around

the lot; after making a sale he would execute paperwork and "prepare the purchased [vehicle] for

departure." *See* Jennings Decl. 2 ¶¶ 17-18, ECF No. 21-1 (preparation involved cleaning, retrieving

keys, assembling documents, and sometimes installing "add-on goods" at the dealership). Second,

Jennings was sometimes tasked with transporting cars from place to place. "If a customer did not

take the vehicle with them at the time of sale because they ordered custom work to be performed

at the dealership, for example," salesmen would "at times . . . deliver the vehicle" directly to the

customer when ready. *Id.* ¶ 19. They would also transport cars as part of "dealer trades," inventory swaps aimed to help different dealerships "meet their respective [sales] needs." *Id.* ¶ 20. Third and finally, Jennings "assist[ed] in the loading and unloading process" for cars, driving new vehicles from the car carrier to the lot and moving "auction-bound [unsold] vehicles" from the lot to the carrier. *Id.* ¶¶ 23-24.

In practice, selling cars was the largest responsibility of the three. Jennings was not often needed to transport cars; customers typically "pick[ed] up [their cars] at the dealership," and if they could not, the dealership would ask external vendors and non-sales employees for delivery assistance before asking salespeople. Second Grayson Decl. 1 ¶ 4, ECF No. 25-1; *see id.* ¶ 3 ("[F]or most vehicles . . . sold at Napleton, it [was] not necessary for a salesperson . . . to physically deliver the car."). The dealership followed a similar practice—asking external vendors and non-sales employees for delivery assistance before asking salespeople—for dealer trades. And although it is not clear how often Jennings helped load and unload car carriers,[1] it is hard to imagine this responsibility taking up more than a sliver of Jennings' working time.

As Jennings tells it, the dealership was not a welcoming workplace. Jennings, an African American man, was one of "two or three" African American employees out of the "sixty to seventy-five employees" who worked at the dealership, and he alleges that he was "subjected to an ongoing, racially hostile culture where frequent racial slurs, comments, stereotypes, and jokes" were the norm. Compl. 4 ¶¶ 28-29, 32, ECF No. 1; *see id.* at 4-6 ¶¶ 34-54 (providing examples). He also alleges that African American employees at the dealership faced more scrutiny and

---

[1] Jennings indicates that the dealership "regularly" sent unsold inventory "to out-of-state car auctions," Jennings Decl. 2 ¶ 24, but "regularly" could reasonably mean every day, every month, or every year, among other intervals. The record is silent on (1) how often the dealership received shipments of new cars, and (2) how often salesmen, as opposed to non-sales employees, were asked to help load and unload.

monitoring than white employees, that the dealership withheld commission payments due to African American employees, and that the dealership retaliated against him for reporting these problems. *See id.* at 6-8 ¶¶ 56-62, 66-68 (scrutiny and monitoring); *id.* at 8 ¶¶ 69-74 (compensation); *id.* at 9-11 ¶¶ 88-102 (retaliation).

The dealership fired Jennings in November 2022.[2] Jennings then obtained a right-to-sue letter from the EEOC and filed the instant suit in federal court.[3] Jennings' complaint asserts claims of (1) a hostile work environment, (2) disparate treatment, and (3) retaliation in violation of 42 U.S.C. § 1981, Title VII, and the Illinois Human Rights Act (IHRA), and it seeks damages, declaratory relief, and injunctive relief.

The complaint makes no mention of an arbitration agreement. Napleton, however, states that Jennings signed a "Non-Solicitation Agreement and Agreement to Arbitrate Employment Claims" (the "Agreement") in September 2020 as a "condition of [his] continued employment." First Grayson Decl. 1 ¶ 4, ECF No. 9-2. The Agreement, as presented by Napleton, contains the following language:

> I AND THE COMPANY AGREE to utilize binding arbitration as the sole and exclusive means to resolve all disputes that may arise out of or be related in any way to my employment with the Company, its affiliates, parents, subsidiaries, divisions and/or related companies. I and the Company each specifically waive and relinquish our respective rights to bring a claim against the other in a court of law and to have a trial by jury. . . . Included within the scope of this Agreement are all disputes, whether based on tort, contract, statute (including, but not limited to, any claims of discrimination, harassment and/or retaliation, whether they be based

---

[2] The firing stemmed from an incident where an employee sat "within earshot" of Jennings and a customer "providing sensitive information" related to a sale, apparently in violation of Napleton policy. Compl. 8 ¶ 76. When Jennings asked the dealership's general manager why the employee was present, the manager provided what Jennings viewed as a "demeaning and aggressive response," and Jennings "responded in kind." *Id.* at 9 ¶¶ 80, 83.

[3] Jennings filed a complaint with both the EEOC and the Illinois Department of Human Rights. The complaint indicates that Jennings "is in the process of obtaining a right to sue notice from the Illinois Department of Human Rights." Compl. 2 ¶ 9. To the extent Jennings obtained such a notice since filing the complaint, it does not appear to have been docketed.

on . . . Title VII of the Civil Rights Act of 1964, as amended, or any other state or federal law or regulation), equitable law, or otherwise. The only exceptions to binding arbitration shall be for claims arising under the National Labor Relations Act which are brought before the National Labor Relations Board, claims for medical and disability benefits under state workers' compensation laws, claims for unemployment insurance, or other claims that are not subject to arbitration under current federal law. . . . [N]othing herein shall prevent me from filing and pursing proceedings before the United States Equal Employment Opportunity Commission or similar state government agency that enforces state fair employment laws (although if I choose to pursue a claim following the exhaustion of such administrative remedies, that claim would be subject to the provisions of this Agreement).

Agreement 1, ECF No. 9-3. Although Jennings says he has "no recollection of ever being presented with, receiving, reviewing, or signing" the Agreement, he acknowledges that "[t]he signature on the [Agreement] . . . appears to be [his] signature." Jennings Decl. 1 ¶¶ 8, 10. Nonetheless, Jennings points to "writing on the [Agreement] in blue ink" that is not his handwriting, insisting that he "would not have signed the [Agreement] . . . if it contained writing from someone other than [himself] in sections of the document reserved for [his] completion, such as dates or printed names." *Id.* ¶¶ 10, 12. For reference, the following portions of the Agreement contain blue ink:

**THIS NON-SOLICITATION AGREEMENT AND AGREEMENT TO ARBITRATE EMPLOYMENT CLAIMS** ("Agreement") made between ED NAPLETON DEALERSHIP GROUP, defined herein as any business owned and/or operated by and/or affiliated directly or indirectly with North American Automotive Services, Inc. including, but not limited to, any and all affiliated operating entities running the day to day operations of any dealerships which are part of and/or which may become part of the Ed Napleton Dealership Group ("Employer" or the "Company") and _____ ("Employee") (collectively, the "Parties").

**MY SIGNATURE BELOW ATTESTS TO THE FACT THAT I HAVE READ, UNDERSTAND, AND AGREE TO BE LEGALLY BOUND TO ALL OF THE ABOVE TERMS. I FURTHER UNDERSTAND THAT THIS AGREEMENT REQUIRES ME TO ARBITRATE ANY AND ALL DISPUTES THAT ARISE OUT OF MY EMPLOYMENT AND TO ABIDE BY THE TERMS OF MY NON-SOLICITATION AGREEMENT AS ABOVE.**

EMPLOYEE

BY:

Name:

Date:

ED NAPLETON DEALERSHIP GROUP

BY:

Name: Bruce Etheridge

Title: Chief Operating Officer

Date: 09/21/2020

Agreement 1-2. Jennifer Brown, a payroll administrator employed by Napleton from April 2019 to September 2021, has filed a declaration indicating that she "printed . . . Jennings' name and the date in blue ink" on the Agreement and watched Jennings sign the form. Brown Decl. 1 ¶ 5, ECF No. 25-2.

In view of the Agreement, Napleton moves for an order (1) compelling arbitration under section 4 of the Federal Arbitration Act (FAA), 9 U.S.C. § 4, and (2) dismissing the complaint for lack of subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1). If the Court does not dismiss the action altogether, Napleton alternatively requests that the Court "stay the current proceedings pending the outcome of binding arbitration." Mot. 1 n.1, ECF No. 9; *see* 9 U.S.C. § 3. Jennings opposes the motion, although he argues that a stay is more appropriate than dismissal if the Court finds his claims to be arbitrable.

## II.    DISCUSSION[4]

A court may compel arbitration under the FAA "if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). "Courts review motions to compel arbitration under a summary judgment standard," meaning they may consider evidence "beyond the pleadings" but "must accept the complaint's allegations as true[] and draw all justifiable inferences in the non-movant's favor." *Lukis v. Whitepages Inc.*, 535 F. Supp. 3d 775, 790 (N.D. Ill. 2021); *Varma v. TCC Wireless, LLC*, 478 F. Supp. 3d 724, 729 (N.D. Ill. 2020) (quotation marks omitted) (citing *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th

---

[4] The Court has jurisdiction over Jennings' complaint pursuant to 28 U.S.C. §§ 1331 and 1343 (Title VII § § 1981 claims) and 28 U.S.C. § 1367 (IHRA claims), and it has jurisdiction over Napleton's motion to compel because it has jurisdiction over the "actual controversy between the parties." *Vaden v. Discover Bank,* 556 U.S. 49, 66 (2009) (quotation marks omitted); 9 U.S.C. § 4.

Cir. 2002)). That said, "[t]he party opposing arbitration bears the burden of establishing why the arbitration provision should not be enforced." *Young v. Shipt, Inc.*, 563 F. Supp. 3d 832, 836 (N.D. Ill. 2021) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91-92 (2000)). If the party opposing arbitration identifies "a triable issue of fact concerning the existence of the [arbitration] agreement," then the motion to compel must be denied. *Tinder*, 305 F.3d at 735.

Napleton argues that the Court should compel arbitration because all three *Zurich* factors are met. Jennings, on the other hand, argues that *Zurich* is inapposite because he is exempt from the FAA. And regardless, Jennings says, the Court should not compel arbitration because (1) the Agreement's arbitration provisions are void under Illinois law, (2) there are genuine disputes of material fact as to the Agreement's authenticity, and (3) the Agreement does not cover "the bulk of his claims." Resp. 14, ECF No. 21. The Court, finding Jennings' arguments unpersuasive, agrees with Napleton.

### A.     The FAA

While the FAA "governs the enforcement, validity, and interpretation of arbitration clauses . . . in both state and federal courts," *Jain v. de Méré*, 51 F.3d 686, 688 (7th Cir. 1995), it specifically exempts from its reach the employment contracts of transportation workers, *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 113-19 (2001) (interpreting 9 U.S.C. § 1). Jennings argues that he qualifies as such a worker, and that this alone warrants denial of Napleton's motion to compel. *See, e.g.*, *Saxon v. Sw. Airlines Co.*, 993 F.3d 492, 503 (7th Cir. 2021) (reversing an order compelling arbitration on this ground), *aff'd*, 142 S. Ct. 1783 (2022).[5] "As the party opposing

---

[5] Even if Jennings were deemed to be a member of a class of transportation workers, that would not necessarily provide a "get out of arbitration free" card. Indeed, on remand of *Saxon*, the defendant successfully moved to compel arbitration under the Illinois Uniform Arbitration Act. *See Saxon v. Sw. Airlines Co.*, No. 19-cv-00403, 2023 WL 2456382, at *2-5 (N.D. Ill. Mar. 10, 2023). The Court notes that the Agreement refers to "binding arbitration under the Federal

arbitration," Jennings "bear[s] the burden of establishing that the [transportation-worker] exemption applies." *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024); *Young*, 563 F. Supp. 3d at 836; *see also, e.g.*, *Osvatics v. Lyft, Inc.*, 535 F. Supp. 3d 1, 9 (D.D.C. 2021) (Jackson, J.).

To qualify as a transportation worker, an individual must belong to a class of workers that "play[s] a direct and necessary role in the free flow of goods" and is "actively engaged in [the] transportation of those goods across borders via the channels of foreign or interstate commerce." *Saxon*, 142 S. Ct. at 1790 (quotation marks omitted); *see Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800-01 (7th Cir. 2020).[6] "To determine whether a class . . . meets [this] definition," the Court must "consider whether the interstate movement of goods is a central part of the class members' job description." *Wallace*, 970 F.3d at 801. That requires not only an assessment of the class's responsibilities, but also a definition of the class itself. *See Saxon*, 142 S. Ct. at 1788-89.

In Jennings' view, the interstate movement of goods is central to the job description of the relevant class: "auto sales workers who buy, sell, and transport vehicles in foreign and interstate commerce." Resp. 4. Recall that, as a car salesman, Jennings was responsible for (1) selling cars, (2) transporting cars to customers and other dealerships, and (3) removing new cars from, and loading old cars onto, car carriers. *See supra* section I. All three responsibilities, Jennings says, are common to the class and involve the interstate movement of goods. As to the first, "auto sales

---

Arbitration Act," Agreement 1, but it takes no position on how this language would affect a non-FAA motion to compel.

[6] As then-Judge Barrett wrote in the *Wallace* opinion: "[I]n determining whether the [transportation-worker] exemption applies, the question is not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce." 970 F.3d at 800 (cleaned up). This means "that a member of the class qualifies for the exemption even if she does not personally engage in interstate commerce." *Id.* (quotation marks omitted).

workers who buy, sell, and transport vehicles in foreign and interstate commerce" regularly "contract[] around [interstate] commerce" and prepare inventory for at least interstate delivery. Resp. 4-5; *see* Jennings Decl. 1 ¶¶ 14-15 (workers receive cars "from other states and internationally," sell to customers located in other states, and prepare vehicles "for out of state travel"). As to the second, transportation requires driving vehicles to out-of-state customers and dealers.[7] Jennings Decl. 1-2 ¶¶ 15, 19-22 (workers "physically transport[] vehicles" across borders). And as to the third, loading and unloading cars traveling in interstate commerce is no different than loading and unloading "cargo on a plane bound for interstate transit." *See Saxon*, 142 S. Ct. at 1790 (holding that workers "who load cargo on and off airplanes" are transportation workers); Jennings Decl. 1-2 ¶¶ 15, 23-25 (workers "assist[] in the loading and unloading of vehicles onto [and from] incoming and outgoing car carriers").

Napleton disagrees. The responsibilities above may be common to the class of auto sales workers, it says, but "common to the class" should not be confused for "central part of the job description." Just as Uber drivers are "in the general business of giving passengers rides, not [in] the particular business of offering interstate transportation to passengers," auto sales workers are in the general business of selling cars. Reply 3, ECF No. 25; *see Mahwikizi v. Uber Techs., Inc.*, No. 22-cv-03680, 2023 WL 2375070, at *4-5 (N.D. Ill. Mar. 6, 2023) ("[I]nterstate transport is not a central feature of Uber drivers' jobs. The data reflects that Uber drivers are in the general business of giving people rides, not in the particular business of offering interstate transportation to passengers. . . . [The] Court concludes that Uber drivers like [the plaintiff] do not fall within

---

[7] Although Napleton faults Jennings for failing to establish "the number of occasions he was [personally] involved in transporting automobiles across state lines related to customer sales or dealership trades," Reply 4, ECF No. 25, the analysis here focuses on the class to which Jennings belongs, not Jennings himself, *see supra* note 6.

Section 1 of the FAA . . . ." (quotation marks omitted)). To the extent auto sales workers interact with interstate commerce, that interaction is either (1) infrequent and incidental, or (2) irrelevant to the Court's inquiry.

To determine which side is correct, the Court must first define the relevant class of workers. The parties seem to agree that the class encompasses "auto sales workers who do what Jennings did," and the Court finds this definition appropriate.[8] *See Saxon*, 142 S. Ct. at 1788 (class is "based on what [an individual] does" for the company). But what, exactly, did Jennings do? It is undisputed that, at a high level, Jennings' job responsibilities included selling, transporting, and loading and unloading cars. It is also undisputed, however, that Jennings transported cars only rarely (if at all).[9] And even viewing the facts in the light most favorable to Jennings, the Court cannot "justifiabl[y] infer[]" that someone employed as a car salesman was primarily focused on driving vehicles to and from car carriers (as opposed to selling cars). *Varma*, 478 F. Supp. 3d at 729 (quotation marks omitted); *see supra* note 1 and accompanying text (noting that the record lacks detail in this regard).[10] Jennings therefore belongs to a class of workers who (1) sell cars,

---

[8] Although the parties use slightly different terms to describe the class—Napleton uses "auto sales employees," Reply 2-4, and Jennings prefers the lengthier "auto sales workers who buy, sell, and transport vehicles in foreign and interstate commerce," Resp. 4—they both engage with all of the job responsibilities Jennings describes. To the extent Napleton believes a more generic definition is appropriate (perhaps just auto sales workers, who may or may not drive cars to customers, interact with carriers, and so on), the Court views the specific definition as the better one. Nonetheless, the Court observes that if "auto sales workers who do what Jennings did" are not transportation workers, then "auto sales workers responsible only for selling cars" are *a fortiori* not transportation workers.

[9] Jennings does not take issue with the dealership's "order of operations" as to transporting vehicles (vendor, non-sales employee, salesman) as articulated in the second Grayson declaration, and he does not attest to how frequently Napleton salesmen (1) actually transported cars, or (2) were asked to do so. In fact, Jennings acknowledges—at least in the context of customer deliveries—that sales workers would only transport vehicles "at times." Jennings Decl. 2 ¶ 19.

[10] Not only is an inference that Jennings spent the majority of his time loading and unloading cars unjustified, but it would also invert the burden of proof on the transportation-worker issue. Jennings could have, if true, stated in his declaration that car salesmen loaded and unloaded

(2) occasionally transport vehicles to customers and other dealers, and (3) occasionally load and unload car carriers. *Cf. Saxon*, 142 S. Ct. at 1789 (concluding that the plaintiff "belongs to a class of workers who physically load and unload cargo on and off airplanes on a frequent basis"). For readability, the Court refers to this class as the "auto sales class" going forward.

Is the interstate movement of goods a "central part" of this class's job description? *Wallace*, 970 F.3d at 801. To define the class is more or less to answer the question. Central to the job description of the auto sales class is, as the name suggests, selling cars; other activities, like transporting vehicles and loading and unloading carriers, are ancillary. Thus, even assuming those activities involve interstate commerce,[11] they do not make members of the auto sales class transportation workers. *See id.* at 800 ("[S]omeone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work."); *see also, e.g.*, *Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1289-90 (11th Cir. 2005) (account manager "who as part of his job duties transports merchandise across the Georgia/Alabama border" is not "within a class of workers within the transportation industry"); *Mahwikizi*, 2023 WL 2375070, at *4 ("That drivers like [the plaintiff] sometimes incidentally take riders across state lines does not make their occupations centered on the interstate movement of goods . . . ." (quotation marks omitted)). Jennings' arguments that

---

cars traveling in interstate commerce at some frequent interval. That he did not, and that the record is silent on the matter, can only work against him.

[11] And it is not clear from the record that they do. The second Grayson declaration, for example, indicates that Napleton was even more inclined to use a vendor for customer and dealership deliveries "over long distances and/or across state lines." Second Grayson Decl. 1 ¶ 3. Insofar as the auto sales class is defined by the work Jennings performed, then, "occasional transportation" does not necessarily involve any interstate transportation. It might be reasonable to infer that Napleton's new and auction-bound cars usually (1) came from, or (2) were destined for another state, but given that Jennings was employed as a car salesman, not a car-carrier loader, that question is of little consequence.

members of the auto sales class are transportation workers because they (1) deliver cars, and (2) load and unload carriers therefore come up short.

Jennings' remaining argument—that members of the auto sales class are transportation workers because they sell and prepare cars traveling in interstate commerce—fails as well. True, as noted, selling cars is central to the job description of the auto sales class. And true, some of the cars sold and prepared in one state (here, Illinois) may be bound for another.[12] But the FAA's transportation-worker exemption "is about what the worker does, not just where the . . . goods have been," *Mahwikizi*, 2023 WL 2375070, at *4, and selling and preparing cars that will travel out of state does not actually involve "moving those goods across state or national borders," *Wallace*, 970 F.3d at 802; *cf. id.* (rejecting the argument that Grubhub drivers are transportation workers because they deliver goods that may have traveled from another state or country). Put differently, selling and preparing cars on a dealership lot does not "actively engage[]" members of the auto sales class in transportation "via the channels of foreign or interstate commerce." *Saxon*, 142 S. Ct. at 1790 (quotation marks omitted). So even though selling cars is "central" to what workers in the auto sales class do, it does not involve "the interstate movement of goods" for purposes of the transportation-worker exemption. *Wallace*, 970 F.3d at 801.

Jennings pushes back against this conclusion. "It is not in dispute," he notes, that the FAA generally applies to the Agreement because Napleton "is [involved] in interstate commerce." Resp. 5; *see* 9 U.S.C. § 2 (provisions of the FAA have force for "contract[s] evidencing . . . transaction[s] involving commerce"); First Grayson Decl. 1 ¶ 2 ("The dealership sells cars and goods that are received from various other states and internationally . . . [and] sells cars to and services customers

---

[12] Although again, it is not clear from the record how often Napleton sold to and/or prepared cars for out-of-state customers, as opposed to residents of Illinois. As noted, silence in the record can only work against Jennings on this point. *See supra* note 10.

who are residents of states other than Illinois . . . ."). How can it be that Napleton is involved in interstate commerce, but its salespeople—the "very feet on the ground for all aspect[s] of [that] . . . commerce"—are not? Resp. 5. It is "illogical," Jennings maintains, to say that "a business [can] be [involved] in interstate commerce, but somehow none of its [sales] workers [can] be considered to be actually engaged in interstate commerce." *Id.* at 6.

But that analysis misses the mark, largely because it construes "engaged in interstate commerce" too broadly. The transportation-worker exemption is a "narrow" one, *Wallace*, 970 F.3d at 803, and again, it applies only to those workers "actively engaged in [the] transportation of . . . goods across borders" via relevant channels, *Saxon*, 142 S. Ct. at 1790 (quotation marks omitted). A company can be involved in interstate commerce and employ salesmen who do not fall into this narrow category: Perhaps, as here, the salesmen facilitate interstate sales but stay almost entirely local. As the Seventh Circuit wrote in rejecting an argument nearly identical to the one advanced by Jennings, "[t]here is . . . nothing remarkable" about a business engaged in interstate commerce employing someone who fails to meet the "stringent" transportation-worker test. *Wallace*, 970 F.3d at 803; *see id.* at 802-03 (noting that "involving commerce," 9 U.S.C. § 2, is much broader than "engaged in . . . commerce," 9 U.S.C. § 1, the language on which the transportation-worker exemption is based).

Given the above, the Court agrees with Napleton. More specifically, the Court agrees that, to the extent members of the auto sales class interact with interstate commerce, that interaction is either (1) incidental rather than central (transporting, loading and unloading), or (2) irrelevant to the Court's inquiry, which focuses on the actual, physical movement of goods rather than where

the goods have been or are going (selling). Members of the auto sales class are not transportation workers, and the FAA's provisions apply to Jennings.[13]

## B.     The Agreement

Even so, Jennings says, the Court should deny Napleton's motion to compel for three reasons. First, the Agreement's arbitration provisions are void under the Illinois Workplace Transparency Act (IWTA), 820 Ill. Comp. Stat. 96/1-1 *et seq.* Second, and in any case, "the making of the [Agreement] is seriously disputed." *Tinder*, 305 F.3d at 735. And third, even assuming no issue of material fact, the Agreement does not cover many of Jennings' claims. *See Zurich*, 417 F.3d at 687. All three arguments fail.

### 1.     The IWTA

The IWTA, which aims to "protect the interest of [the] State in ensuring all workplaces are free of unlawful discrimination and harassment," declares certain types of employment agreements unenforceable. 820 Ill. Comp. Stat. 96/1-5. As relevant here, the Act states the following:

> Any agreement, clause, covenant, or waiver that is a unilateral condition of employment or continued employment and requires the employee or prospective employee to waive, arbitrate, or otherwise diminish any existing or future claim,

---

[13] This conclusion accords with common sense, as few would say that car salesmen "perform[] work analogous to that of seamen and railroad employees." *Wallace*, 970 F.3d at 802; *see* 9 U.S.C. § 1 ("[N]othing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."); *Cir. City*, 532 U.S. at 114-15 (deriving the transportation-worker exemption in part from the canon of *ejusdem generis*, which says that "where general words follow specific [ones] in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects [previously] enumerated" (cleaned up)). It is also accords with the holdings of other courts, which have "uniformly enforced the arbitration agreements entered into by the employees of car dealerships under the FAA." *Tran v. Tex. Lincoln Mercury, Inc.*, No. 07-cv-01815, 2007 WL 2471616, at *5 (S.D. Tex. Aug. 29, 2007); *see, e.g.*, *id.* at *5-6 (salesman and manager); *Doucette v. CarMax Auto Superstores Inc.*, No. 19-cv-10031, 2020 WL 1332836, at *3-5 (D. Mass. Mar. 23, 2020) (salesman who occasionally arranged interstate transportation); *Galarza v. Greenway Auto., Inc.*, No. 16-cv-01251, 2016 WL 11430952, at *1 (M.D. Fla. Dec. 19, 2016) (manager who routinely drove cars to other states); *Drawdy v. Don Jackson Chrysler Dodge Jeep, Inc.*, No. 14-cv-03490, 2015 WL 12591774, at *3 (N.D. Ga. Feb. 5, 2015) (salesman).

> right, or benefit related to an unlawful employment practice to which the employee
> or prospective employee would otherwise be entitled under any provision of State
> or federal law, is against public policy, void to the extent it denies an employee or
> prospective employee a substantive or procedural right or remedy related to alleged
> unlawful employment practices, and severable from an otherwise valid and
> enforceable contract under this Act.

*Id.* 96/1-25(b). Jennings argues that this language effectively voids the Agreement's arbitration provisions: Napleton imposed those provisions (and the Agreement as a whole) as a unilateral condition of continued employment,[14] and they require Jennings to arbitrate any claim related to an unlawful employment practice. *See id.* 96/1-15 (defining "[u]nilateral condition of . . . continued employment" as something "an employer requires an employee . . . to accept as a non-negotiable material term in order to . . . retain employment," and "[u]nlawful employment practice" as "any form of unlawful discrimination, harassment, or retaliation" actionable under, among other statutes, Title VII and/or Article 2 of the IHRA). The provisions are thus "against public policy," and Illinois courts will not enforce them. *Id.* 96/1-25(b); *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 370 (Ill. 1998); *see also, e.g.*, *Swanson v. Sw. Airlines Co.*, No. 21-cv-05595, 2023 WL 5509357, at *4 (N.D. Ill. Aug. 26, 2023). Alternatively, Jennings argues that the above language voids the arbitration provisions outright. Those provisions, after all, deprive Jennings "of his . . . right[] to a jury trial by demanding [that] he pursue his claims in arbitration." Resp. 8.

---

[14] Napleton disputes this assertion, arguing instead that the arbitration provisions were a mutual condition of continued employment. 820 Ill. Comp. Stat. 96/1-25(c); *see id.* 96/1-15 (defining "[m]utual condition of . . . continued employment" as something "negotiated between an employer and an employee . . . in good faith for consideration in order to . . . retain employment"). But because the Agreement does not explicitly acknowledge certain employee rights, the IWTA creates a "rebuttable presumption" that Napleton acted unilaterally. *See id.* 96/1-25(c)-(d). Napleton has not rebutted that presumption: The record shows no evidence of good-faith negotiation, and Napleton itself indicates that it merely "presented" the Agreement to Jennings for signature. First Grayson Decl. 1 ¶ 4; *see also* Brown Decl. 1-2 ¶¶ 4, 6. Jennings is therefore correct that (1) a unilateral condition of employment is at issue, and (2) the portion of the IWTA cited above applies.

Jennings' claims, even if correct as a matter of Illinois law,[15] run headlong into the FAA. That law applies here, and as an apparent matter of first impression,[16] it preempts the relevant language of the IWTA. *See supra* section II.A; *Preston v. Ferrer*, 552 U.S. 346, 353 (2008) (noting that "[t]he FAA's displacement of conflicting state law," which "forecloses state . . . attempts to undercut the enforceability of arbitration agreements," is well established "and has been repeatedly reaffirmed" (cleaned up)).

The Supreme Court laid out the test for FAA preemption in *AT&T Mobility LLC v. Concepcion*, where it distinguished between two categories of state laws: those that "prohibit[] outright the arbitration of a particular type of claim," and those that are "generally applicable" but can be "applied in a fashion that disfavors arbitration." 563 U.S. 333, 341 (2011). The analysis for laws in the second category is case specific,[17] but as a general rule, they "are preempted if in

---

[15] Given the discussion that follows, the Court need not decide whether the Agreement's arbitration provisions are unenforceable or otherwise void under the IWTA. The parties do not dispute that Illinois law governs the Agreement.

[16] To the Court's knowledge, all prior decisions to consider both the IWTA and the FAA either found the IWTA inapplicable or the preemption argument forfeited. *See Saxon*, 2023 WL 2456382, at *5 (no unlawful employment practice at issue); *Swanson*, 2023 WL 5509357, at *4 (agreement signed before IWTA's effective date); *Nanberg v. 21st Century Flooring, LLC*, No. 21-cv-06623, 2022 WL 4482761, at *2-3, *3 n.3 (N.D. Ill. Sept. 27, 2022) (same); *Budzyn v. KFC Corp.*, No. 21-cv-04152, 2022 WL 595735, at *3 (N.D. Ill. Feb. 28, 2022) (same); *Snow v. Pepsi MidAmerica Co.*, No. 21-cv-01206, 2022 WL 2106249, at *6 (S.D. Ill. June 10, 2022) (question delegated to arbitrator); *Wembi v. Gibson's Rest. Grp. Mgmt. Co.*, No. 21-cv-00586, 2021 WL 2272399, at *2 (N.D. Ill. May 13, 2021) (argument forfeited). In this case, however, the IWTA applies and Jennings has not forfeited his preemption argument. Regarding the former, Jennings signed the Agreement after the IWTA's effective date, there are unlawful employment practices at issue, and the Agreement specifies that disputes "regarding . . . scope or enforceability . . . shall be resolved by a court." Agreement 1-2; *see* 820 Ill. Comp. Stat. 96/1-10(c), 96/99-99 (effective date of IWTA is January 1, 2020). Regarding the latter, although Jennings does not specifically reference preemption, the Court considers his argument that the motion to compel should be denied under the IWTA sufficient to preserve the issue. Jennings implicitly argues that the IWTA is not preempted, perhaps because it falls within the FAA's savings clause. *See infra* note 17.

[17] The FAA states that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereunder . . . shall be valid,

practice they have a disproportionate impact on arbitration or interfere with fundamental attributes of arbitration and thus create a scheme inconsistent with the FAA." *Mortensen v. Bresnan Commc'ns, LLC*, 722 F.3d 1151, 1159 (9th Cir. 2013) (cleaned up); *see Concepcion*, 563 U.S. at 341-44. The analysis for laws in the first category, on the other hand, "is straightforward: The conflicting rule is displaced." *Concepcion*, 563 U.S. at 341.

The IWTA, as Jennings attempts to apply it, falls squarely into the first category. By making unenforceable (either via public policy or voidness) "[a]ny [unilateral] agreement . . . [to] arbitrate" claims of workplace misconduct, the IWTA categorically prohibits "the arbitration of a particular type of claim." 820 Ill. Comp. Stat. 96/1-25(b); *Concepcion*, 563 U.S. at 341. Its language to that effect is therefore preempted by the FAA, and Jennings cannot rely on that language in opposing Napleton's motion to compel. *Cf. Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532-33 (2012) (per curiam) (finding preempted a West Virginia law prohibiting "agreements to arbitrate personal-injury or wrongful-death claims against nursing homes"). His argument that the IWTA prevents arbitration is unavailing.

### 2. Formation

IWTA aside, Jennings argues that compelling arbitration in response to Napleton's motion would be premature. That is so, in Jennings' view, because there are "genuine disputes of material fact concerning" the formation, and thus the validity, of the Agreement. Resp. 10. Those disputes "at minimum" require discovery to resolve, so the motion must—at least for the time being—be

---

irrecoverable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The second portion of this sentence—the FAA's savings clause—allows individuals to resist arbitration using "generally applicable" contract defenses "such as duress or . . . unconscionability." *Concepcion*, 563 U.S. at 341. The Supreme Court clarified in *Concepcion* that while the savings clause preserves such generally applicable defenses, "nothing in it suggests an intent to preserve [ostensibly generic] state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 343.

denied. *Id.*; *see Tinder*, 305 F.3d at 735 ("A district court must promptly compel arbitration once it is satisfied that the parties agreed to arbitrate. But if the . . . court determines that the making of the arbitration agreement is seriously disputed, the court shall proceed summarily to the trial thereof." (cleaned up)).

Jennings flags two specific disputes "that [any] reasonable fact finder would need [resolved] before wholesale accepting" that the Agreement is valid. Resp. 12. First, Jennings points to the text in blue ink. That text contains someone else's handwriting, he notes, and his declaration indicates "under no uncertain terms that he would not have signed a contract if it contained writing that was not his." *Id.* at 13. Additionally, the declaration states that Jennings "would not have signed any contract" with Napleton without first (1) entering the date below the signature line, and (2) printing his name where required. *Id.* But those are the precise areas of the Agreement where the blue text appears. *See supra* section I. Second, Jennings emphasizes that he "has no memory of discussing arbitration with [Napleton] or ever signing an arbitration agreement." Reply 12. Taken together, Jennings argues, these disputes create a triable issue of fact as to whether he actually signed the Agreement.[18]

---

[18] Jennings also argues that Napleton "fail[ed] to properly authenticate the Agreement" because, in support of the Agreement's validity, it proffered only a secondhand account of the signing not based on personal knowledge. Resp. 11; *see* First Grayson Decl. 1 ¶ 4 ("In September 2020, as a condition of continued employment, Napleton presented Jennings with a Non-Solicitation Agreement and Agreement to Arbitrate Employment Claims . . . ."); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Napleton filed a new declaration addressing this argument, however, and the Court sees no reason to consider the argument in detail here. *See* Brown Decl. 1-2 ¶¶ 4-7; *Lyon Fin. Servs., Inc. v. Jude's Med. Ctr., Ltd.*, No. 10-cv-06957, 2011 WL 6029195, at *3 (N.D. Ill. Dec. 5, 2011) ("Because [the non-movant] contested the basis for the affidavit in his response brief, it was appropriate for [the movant] to include additional support with its reply.").

Not so. As Napleton points out, Jennings "carefully avoids outright denying" that he signed the Agreement. Reply 8. He does not affirmatively state, in other words, that he *did not* sign the Agreement; he simply asserts, speculatively, that he (1) *would not* have signed the Agreement, and (2) *does not remember* doing so. The case law in this District draws a clear line between a plaintiff's testimony that "he or she does not remember receiving or executing an arbitration agreement" (insufficient to create a genuine dispute of fact) and a plaintiff's testimony "unequivocally den[ying] ever receiving or signing" such an agreement (sufficient to create such a dispute), and Jennings falls on the "does not remember" side of the line.[19] *See Muhammad v. Dollar Tree*, No. 18-cv-04192, 2020 WL 1530750, at *4 (N.D. Ill. Mar. 31, 2020) (emphasis omitted) (citing cases); *compare, e.g.*, *Tinder*, 305 F.3d at 735-36 (affidavit stating that plaintiff "does not recall seeing or reviewing" arbitration agreement does not raise factual issue (quotation marks omitted)), *with Wembi v. Gibson's Rest. Grp. Mgmt. Co.*, No. 21-cv-00586, 2021 WL 2272399, at *2 (N.D. Ill. May 13, 2021) (affirmative statement by plaintiff that he "never signed the arbitration agreement . . . [or] knew of its existence," rooted in firsthand knowledge and "made under threat of penalty of perjury," sufficient to create dispute).

Jennings' assertions, therefore, are not enough to create a genuine issue of material fact. Jennings avers "only that [he] does not remember" signing (or would not have signed) the Agreement, "whereas the uncontroverted" declaration of Jennifer Brown indicates that, on September 30, 2020, Brown "printed . . . Jennings' name and the date in blue ink on the . . . Agreement," personally handed the Agreement to Jennings, and watched him sign. *Tinder*, 305

---

[19] In the Court's view, the "would not have signed" statement carries no more weight than the "does not remember" statement for purposes of the relevant analysis. To the extent the statements differ, however, Jennings offers no explanation as to why he would have refused to sign a document merely because his name was already printed on it. The signature, not the text in blue ink, bound Jennings to the Agreement.

F.3d at 736; Brown Decl. 1 ¶ 5; *see id.* at 1-2 ¶¶ 4-6. Perhaps Jennings now (1) believes he would not have signed the Agreement, or (2) has forgotten that he signed. But Jennings' signature is on the document, a Napleton employee witnessed him sign it on the relevant date, and no record evidence casts doubt on either of those facts. Because Jennings has not "identif[ied] specific evidence in the record demonstrating a material factual dispute" as to whether he and Napleton "are bound by a contract to arbitrate," his argument regarding formation, too, is unavailing.[20] *Tinder*, 305 F.3d at 735.

### 3. Scope

All of the above notwithstanding, Jennings still insists that Napleton's motion to compel arbitration should be denied, at least in part. The FAA may apply, and the Agreement may be valid and enforceable. But compelling arbitration requires "a dispute within the scope of the arbitration agreement," *Zurich*, 417 F.3d at 687, and Jennings maintains that the Agreement does not cover "the bulk of [the relevant] claims," Resp. 14. To support that argument, Jennings cites *Hendrick v. Brown & Root, Inc.*, a case from the Eastern District of Virginia, for the proposition that "an arbitration agreement may not be used to reach back to cover disputes arising before the agreement was executed." 50 F. Supp. 2d 527, 537 (E.D. Va. 1999) (quotation marks omitted). Jennings signed the Agreement in September 2020, but the complaint alleges "that he was subjected to racial harassment and disparate treatment based on his race" beginning in 2019; under *Hendrick*, it would

---

[20] Jennings does not argue that the Agreement is invalid for any other reason, such as lack of consideration. *See* Mem. 8-11, ECF No. 9-1 (explaining that the Agreement "is a valid and enforceable contract" because it "consists of an offer, an acceptance, and consideration"). That is probably wise, as there is no dispute that Napleton offered the Agreement to Jennings, and "continued employment is sufficient consideration for the enforcement of employment agreements" under Illinois law. *Melena v. Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109 (Ill. 2006); *see also, e.g.*, *Muhammad*, 2020 WL 1530750, at *3 (mutual promises to arbitrate can act as consideration).

be "inappropriate to compel . . . arbitration on claims that accrued" before the Agreement's effective date. Resp. 14.

But Jennings omits key language from *Hedrick*. Here is the remainder of the sentence just quoted: "[A]n arbitration agreement may not be used to reach back to cover disputes arising before the agreement was executed, *unless such preexisting disputes are brought within the scope of the clause*." *Hendrick*, 50 F. Supp. 2d at 537 (quotation marks omitted). That addition is critical here, as the Agreement clarifies that it applies to "all disputes . . . aris[ing] out of or . . . related in any way to" Jennings' employment with Napleton.[21] Agreement 1. Clauses that "speak[] in terms of relationships and not timing" encompass all claims, past and future, and it follows that the Agreement explicitly brings "preexisting disputes . . . within [its] scope." *Whisler v. H.J. Meyers & Co.*, 948 F. Supp. 798, 802 (N.D. Ill. 1996) (quotation marks omitted); *Hendrick*, 50 F. Supp. 2d at 537 (cleaned up). Jennings' argument to the contrary lacks merit, and to the extent claims arising after September 2020 must be submitted to arbitration, claims arising before that date must be submitted to arbitration as well.

So, are claims arising after September 2020 within the scope of the Agreement? The answer is a clear (and undisputed) yes. Jennings' claims intuitively arise out of and/or relate to his employment at Napleton, and as Napleton points out, "harassment, discrimination, and retaliation claims are specifically identified as the type of claims covered by the . . . Agreement." Mem. 12,

---

[21] And *Hendrick*, which concerned "four discrete and separate . . . agreements spanning specific periods of time and with lengthy gaps between each agreement," is distinguishable in any event. *See Levin v. Alms & Assocs.*, 634 F.3d 260, 269 (4th Cir. 2011) (cabining *Hendrick* and holding that an arbitration clause applying to "any dispute between the parties" has retroactive effect (quotation marks omitted)); *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993) (stating the more general rule that "arbitration agreements are . . . to be broadly construed . . . in favor of coverage" and rejecting the assertion that "an agreement to arbitrate a dispute must pre-date the actions giving rise to the dispute" to be enforceable).

20

ECF No. 9-1 (quotation marks omitted); *see* Agreement 1 ("Included within the scope of this Agreement are all disputes, . . . including, but not limited to, any claims of discrimination, harassment and/or retaliation . . . [under] Title VII . . . or any other state or federal law or regulation . . . ."). All of the claims asserted by Jennings are therefore covered by the Agreement and arbitrable.

*     *     *

To recap: Because (1) Jennings is not a transportation worker, and (2) the FAA preempts the language in the IWTA barring arbitration, the FAA governs the Agreement. There is no genuine dispute that the Agreement is valid and binding, and all of Jennings' claims (regardless of accrual date) fall within the scope of the Agreement itself. And finally, as evidenced by the filing of this suit and Jennings' opposition brief, there has been "a refusal to arbitrate." *Zurich*, 417 F.3d at 687. All three *Zurich* factors are met, and the Court grants Napleton's motion to compel arbitration under the FAA. *See* 9 U.S.C. § 4.

### C.     Motion to Dismiss

Napleton asserts that, in light of its decision to compel arbitration, the Court must (or at least should) dismiss Jennings' complaint pursuant to Fed. R. Civ. P. 12(b)(1). Napleton does not elaborate on or provide case law in support of its assertion; instead, it implies that a finding of arbitrability deprives the Court of jurisdiction and requires dismissal with prejudice on that ground. *See, e.g.*, Mot. 2 ¶ 4 ("Thus, in light of the mandates of the [FAA] and [the] contractual agreement, . . . this Court should compel arbitration of this matter and order [the claims] to be heard exclusively in an arbitral forum. In doing so, this Court should dismiss [the] Complaint, with prejudice, for lack of jurisdiction . . . .").

Napleton's implication is incorrect. "An arbitration clause is a type of forum-selection clause," and an agreement to arbitrate "does not affect a district court's subject-matter jurisdiction." *Grasty v. Colo. Tech. Univ.*, 599 F. App'x 596, 597 (7th Cir. 2015). Because the Court has jurisdiction over this case, *see supra* note 4, and because its jurisdiction persists regardless of whether there is a valid, enforceable arbitration agreement, the Court finds dismissal under Fed. R. Civ. P. 12(b)(1) inappropriate.[22] Napleton's motion to dismiss for lack of jurisdiction is denied.

Napleton's request for a stay, however, is granted. *See* Mot. 1 n.1 (requesting a stay as an alternative to dismissal). The Court is "satisfied that the issue[s] involved in [this] suit . . . [are] referable to arbitration," and the FAA requires the Court to issue a stay "on application of one of the parties" when that is the case. 9 U.S.C. § 3; *see Smith v. Spizzirri*, 144 S. Ct. 1173, 1178 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). This matter is accordingly stayed "until . . . arbitration has been had in accordance with the terms of the [A]greement." 9 U.S.C. § 3. Should Jennings choose not to arbitrate his claims, the Court will lift the stay and take further action as appropriate.

## III.    CONCLUSION

For the foregoing reasons, Napleton's motion to compel arbitration and dismiss the complaint is granted in part and denied in part. The motion is granted insofar as it seeks an order compelling arbitration, and denied insofar as it seeks dismissal of the complaint. This case is stayed

---

[22] Perhaps, had Napleton moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(3), the Court's dismissal analysis would be different. *See, e.g.*, *Grasty*, 599 F. App'x at 597; *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 772-73 (7th Cir. 2014). Regardless, as discussed below, the Court must issue a stay here.

pending arbitration of Jennings' claims. Within 60 days, Jennings is directed to submit his claims to individual arbitration or notify the Court of his intention not to do so.

Date: February 11, 2025

John J. Tharp, Jr.
United States District Judge